STATE OF MINNESOTA

IN SUPREME COURT

A23-0149

Court of Appeals

Moore, III, J.
Took no part, McKeig, Hennesy, and Gaïtas, JJ.
Dietzen, Christopher J., Acting Justice[1]

Tina Marie Lund, as conservator of
the Honorable Fred Karasov,

        Appellant,

vs.

Filed: May 21, 2025
Office of Appellate Courts

Calhoun Orange, Inc. d/b/a
Orange Theory Fitness Minneapolis-Uptown,

        Respondent,

Ultimate Fitness Group LLC, d/b/a
Orangetheory Fitness,

        Respondent.

————————————————

Jacob F. Siegel, Brandon Thompson, Kathleen Flynn Peterson, Colin F. Peterson, Ciresi Conlin LLP, Minneapolis, Minnesota, for appellant.

Julia J. Nierengarten, John E. Radmer, Meagher + Geer, P.L.L.P., Minneapolis, Minnesota, for respondent Calhoun Orange, Inc. d/b/a Orange Theory Fitness Minneapolis-Uptown.

Theodore J. Waldeck, Jason M. Stoffel, Waldeck & Woodrow, P.A., Minneapolis, Minnesota, for respondent Ultimate Fitness Group LLC, d/b/a Orangetheory Fitness.

[1]     Appointed pursuant to Minn. Const. art. VI, § 2, and Minn. Stat. § 2.724, subd. 2 (2024).

Raoul Shah, Robins Kaplan LLP, Minneapolis, Minnesota, for amicus curiae Minnesota Association for Justice.

Paul W. Magyar, Foley & Mansfield, PLLP, Minneapolis, Minnesota, for amicus curiae Minnesota Defense Lawyers Association.

_____

S Y L L A B U S

A contractual provision that shields a party from future liability for their own negligent acts is subject to strict construction and is enforceable only when the provision clearly and unequivocally states the parties' intent that the contract shift liability for the party's own negligent acts. If a contract includes two clauses that both contain liability-shifting language, those two clauses must be read together to determine whether the entire document manifests a clear and unequivocal intent to encompass liability arising from acts of negligence.

Affirmed.

O P I N I O N

MOORE, III, Justice.

When Fred Karasov joined respondent Calhoun Orange's fitness center in 2017, he was required to sign a one-page "Client Intake Form," which contained liability-shifting provisions benefitting Calhoun Orange. In 2019, while participating in a workout class at Calhoun Orange, Karasov suffered cardiac arrest and collapsed, resulting in significant, permanent brain injuries. Karasov's conservator, Tina Lund, sued Calhoun Orange, alleging that its negligence was the cause of Karasov's injuries. The district court granted summary judgment to Calhoun Orange on Lund's claims of negligence, negligent

undertaking, and medical negligence, concluding that they were barred by exculpatory language in the Client Intake Form. A jury returned a verdict for Calhoun Orange on Lund's claim of willful and wanton negligence. Lund appealed the district court's grant of summary judgment on her negligence, negligent undertaking, and medical negligence claims, and the court of appeals affirmed. We granted review of the question of whether the Client Intake Form is enforceable to shield Calhoun Orange from liability for claims arising from its own negligence.

Because the Client Intake Form signed by Karasov contains a provision that is a clear and unequivocal expression of the parties' intent to indemnify Calhoun Orange for acts of its own negligence, and because additional waiver language in the liability paragraph does not make that intent less clear, we conclude that the clause is enforceable and bars Lund's claims of ordinary negligence. Accordingly, we affirm the decision of the court of appeals affirming the district court's grant of summary judgment to Calhoun Orange.

**FACTS**

In February 2017, Fred Karasov became a member at Calhoun Orange, a fitness studio that formerly operated in the Uptown neighborhood of Minneapolis.[2] As part of the membership process, Calhoun Orange required Karasov to complete and sign a document titled "Client Intake Form." The top of the form asked for information such as the member's height, weight, and address. The bottom of the form contained several

---

[2] Calhoun Orange, which was a franchisee of the nationwide chain Orangetheory Fitness, has since ceased operations.

paragraphs enumerating various fitness center policies, including a cancellation policy, an age policy, and a dress code policy.

The middle of the form contained, in a smaller font than the other parts of the form, four enumerated paragraphs, introduced with the following sentence: "I (the 'Client') voluntarily desire to participate in physical exercise training classes conducted on behalf [sic] Orangetheory Fitness Uptown 2640 Hennepin Aveue [sic], Minneapolis, MN. [sic] 55408 and understand agree [sic] to the following." Our focus is on the liability-shifting waiver provisions contained in the fourth numbered paragraph (the "liability paragraph") of the Client Intake Form. This paragraph read:

> Client has been informed that any fitness program includes possible risks and all exercises shall be undertaken at Client's sole risk and discretion. Client assumes full responsibility for any and all damages, injuries or losses that may be sustained or incur, if any, while participating in any studio exercise program or physical activity. Client hereby waives all claims against the Studio, the Facility, the Studio instructors, officers, directors, employees or agents of either and/or any successor assigns or [sic] and all claims, demands, injuries, damages, actions, or causes of action, whatsoever to my person or property arising out of or connected to the services, facilities, exercise classes, or the facility where same is located (including the Studio and/or the Facility, as applicable). Client hereby agrees to indemnify [sic] defend, hold harmless, release and discharge the Studio and Facility from all claims, demands, injuries, damage actions [sic] causes of action and from all acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and assigns, whatsoever, for any damages, injuries or losses that may be sustained by the Client arising from or in connection with the activities that Client voluntarily participates [sic], including without limitation, attorney's fees, costs, and expenses of any litigation, arbitration or other proceeding.

Karasov signed the bottom of the form.

On September 7, 2019, while participating in an exercise class at Calhoun Orange, Karasov suffered cardiac arrest and collapsed. A class participant notified the Calhoun

4

Orange trainer that Karasov had collapsed, and the trainer "yelled for someone to call 911 and for someone to grab the AED." While someone called 911, two others, both nurses, began administering CPR and performing pulse checks. But Calhoun Orange's automated external defibrillator (AED)—which had been brought into the fitness room by another Calhoun Orange employee and placed on the ground next to Karasov—was not administered until paramedics arrived approximately 15 minutes later. The paramedics successfully resuscitated Karasov with one shock from the AED and then brought him to Hennepin County Medical Center. Karasov suffered significant brain damage due to the prolonged deprivation of oxygen to his brain and is now permanently disabled. Karasov now requires a wheelchair and other adaptive equipment, assistance with all basic activities of daily life, and constant supervision.

Tina Lund—Karasov's partner and conservator—sued Calhoun Orange and its parent company. On Lund's claims of negligence, medical negligence, and negligent undertaking, the district court found that the liability paragraph shielded Calhoun Orange from Lund's claims of ordinary negligence and granted Calhoun Orange's motion for summary judgment.[3] The district court found that the claims were barred by a part of the liability paragraph stating that "[c]lient hereby waives all claims against the Studio . . . arising out of or connected to the services, facilities, exercise classes, or the facility where same is located."

---

[3] Lund brought several other claims against both Calhoun Orange and its parent company that are not before us. Her claim of willful and wanton negligence was tried before a jury, which found for Calhoun Orange. The parent company was dismissed from the appeal to this court by stipulation of the parties.

Lund appealed, arguing that under a recently decided case of our court—*Justice v. Marvel, LLC*, 979 N.W.2d 894 (Minn. 2022)—this language from Calhoun Orange's liability paragraph should be treated as unenforceable as to her claims of ordinary negligence. *Lund v. Calhoun Orange, Inc.*, No. A23-0149, 2023 WL 8368507, at *4 (Minn. App. Dec. 4, 2023). In *Justice*, we decided that a waiver encompassing "any and all claims" was insufficient under our strict construction standard governing exculpatory clauses to be enforceable against claims arising from the defendant's own negligence. 979 N.W.2d at 895 (internal quotation marks omitted). The court of appeals agreed with Lund that the exculpatory language in the third sentence of the liability paragraph relied upon by the district court must fail under the strict construction standard from *Justice*, but the court affirmed the dismissal of Lund's negligence claims based on the fourth sentence in the paragraph: "[c]lient hereby agrees to indemnify . . . the Studio and Facility from all claims . . . and from all acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and assigns." *Lund*, 2023 WL 8368507, at *4.

Lund now asks our court to reverse the court of appeals, arguing that Calhoun Orange's liability paragraph is unenforceable under our precedent concerning contractual language that purports to indemnify or exculpate a party for its own negligence.

**ANALYSIS**

We review a grant of summary judgment de novo. *Justice*, 979 N.W.2d at 898. Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.01. Here,

6

the district court found that Lund's claims of negligence, medical negligence, and negligent undertaking could not survive summary judgment due to liability-shifting language in the Client Intake Form signed by Karasov. The question before us therefore is whether Calhoun Orange's liability-shifting provision is enforceable against Lund's claims.[4]

## A.

We begin with a review of our case law concerning the enforceability of liability-shifting contractual provisions. When interpreting a contract, we generally apply a standard of fair construction, seeking an interpretation that is not "unduly liberal or harshly strict . . . but . . . that will accomplish [the contract's] stated purpose." *Indep. Sch. Dist. No. 877 v. Loberg Plumbing & Heating Co.*, 123 N.W.2d 793, 799 (Minn. 1963) (citation omitted) (internal quotation marks omitted). But we analyze two types of clauses in contracts—exculpatory clauses, which purport to absolve a party from liability, and indemnity clauses, which shift liability away from the benefitted party to another party— under a standard of *strict* construction. *See Dewitt v. London Rd. Rental Ctr., Inc.*, 910 N.W.2d 412, 416–17 (Minn. 2018) (analyzing an indemnity clause); *Solidification, Inc. v. Minter*, 305 N.W.2d 871, 873 (Minn. 1981) (analyzing an exculpatory clause). We have long held that when contractual provisions "exonerate[] a party from liability" they must

---

[4] Calhoun Orange argues that even if the liability-shifting clause in this case was unenforceable, Lund's ordinary negligence claims would be barred by the doctrine of collateral estoppel based on the jury verdict on the claim of willful and wanton negligence. *See Mach v. Wells Concrete Prods. Co.*, 866 N.W.2d 921, 927 (Minn. 2015) (citation omitted) (internal quotation marks omitted) ("[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."). Because we find the indemnity clause to be enforceable, we need not reach this issue.

be "strictly construed against the benefited party" because such provisions are "not favored in the law." *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982). While these two types of clauses are not identical, and we have discussed them separately, in *Justice* we clarified our law and held that both "indemnity clauses and exculpatory clauses are subject to the same standard of strict construction." *Justice*, 979 N.W.2d at 900.[5]

Under strict construction, contractual provisions that "purport[] to release the benefited party from liability for intentional, willful or wanton acts" are void and unenforceable. *Schlobohm*, 326 N.W.2d at 923. But "parties to a contract may, without violation of public policy, protect themselves against liability resulting from their own negligence." *Id*. at 922–23. That a contractual provision is so broad "that it necessarily includes the indemnitee's own negligence" does not necessarily mean that it survives strict construction. *Dewitt*, 910 N.W.2d at 417. A party seeking to shield itself from liability for acts of its own ordinary negligence "must use specific, express language that clearly and unequivocally states the contracting parties' intent" to include negligence in the scope of the waiver. *Id*. (citation omitted) (internal quotation marks omitted).

---

[5] In *Justice*, we recognized that "[t]he difference between an exculpatory clause and an indemnity clause is that generally, '[a]n exculpatory clause purports to deny an injured party the right to recover damages from the person negligently causing the injury, while an indemnification clause attempts to shift the responsibility for the payment of damages to someone other than the negligent party.' " *Justice*, 979 N.W.2d at 901 (quoting 57A Am. Jur. 2d *Negligence* § 43 (2022)). But we also recognized their similarity, in that "sometimes, an indemnification clause shifts liability 'back to the injured party, thus producing the same result as an exculpatory provision.' " *Id*. (quoting 57A Am. Jur. 2d Negligence § 43).

In our most recent case applying the strict construction standard, *Justice v. Marvel, LLC*, we considered a question of first impression: "how strict construction applies when an exculpatory clause purports to release all claims of liability without specific reference to negligent acts." 979 N.W.2d at 899. *Justice* involved claims of negligence brought by an 18-year-old for injuries he sustained at an amusement play area when he was seven years old. *Id.* at 896. The appellant's mother had signed a waiver that purported to exculpate the company that owned the play area for "any and all claims," and one of the questions before us was whether such a waiver was sufficiently "clear" and "unequivocal" to be enforceable against claims of negligence. *Id*. at 902 (internal quotation marks omitted). We held that it was not. *Id*. We determined that although the phrase "any and all claims" was theoretically broad enough to encompass claims of negligence, the language was not specific enough to manifest a "clear and unequivocal" intent of the parties to shield the company from liability for its own negligence and was therefore unenforceable. *Id.* (internal quotation marks omitted).

But in *Justice*, we left undisturbed our line of cases recognizing that waiver clauses that do explicitly express a party's intent to shield itself from liability for acts of its own negligence *are* enforceable as bars to negligence claims. *Schlobohm* is illustrative here. *See* 326 N.W.2d at 920. *Schlobohm* involved a lawsuit for negligence against a health spa by one of its customers for injuries sustained while using a weightlifting machine. *Id*. at 922. The *Schlobohm* court described that because "the claims of the respondents [were] based on negligence" and made "no claim that Spa Petite or its employees acted willfully, intentionally or wantonly," that therefore, because the waiver at issue "specifically

9

purport[ed] to exonerate Spa Petite from liability for acts of negligence and negligence only," strict construction did not bar judicial enforcement of the clause. *Id.* at 923. In *Justice*, we reaffirmed that an indemnity clause is enforceable under strict construction when it includes "an express provision that indemnifies the indemnitee for liability occasioned by its own negligence," and when it "fairly apprise[s] [the indemnitor], in clear and unequivocal language, that the provision made [the indemnitor] liable for claims against [the indemnitee] related to [the indemnitee's] own conduct." *Justice*, 979 N.W.2d at 899–900 (quoting *Dewitt*, 910 N.W.2d at 417, 419) (internal quotation marks omitted). This standard controls in this case, and we turn next to its application here.

B.

The strict construction standard requires us to determine whether Calhoun Orange's Client Intake Form manifested a clear and unequivocal intent by the parties to shield Calhoun Orange from claims arising from its own negligence. Though this is a close case, we conclude that the exculpatory clause in the third sentence when read together with the indemnification clause in the fourth sentence of the form's liability paragraph— specifically the fourth sentence's language stating "[c]lient hereby agrees to indemnify . . . the Studio and Facility from all claims . . . and from all acts of active or passive negligence" of Calhoun Orange and those acting on its behalf—"clearly and unequivocally state[] the contracting parties' intent" to shield Calhoun Orange from liability for its own negligence. *Dewitt*, 910 N.W.2d at 417 (citation omitted) (internal quotation marks omitted). Therefore, the liability paragraph of the Client Intake Form is enforceable to bar Lund's claims of ordinary negligence against Calhoun Orange for Karasov's injuries.

Lund contends that despite this explicit language within the indemnification clause referencing acts of negligence, the clause is unenforceable. Lund offers three primary theories in support of her position: one relying on the analysis put forth by the dissent at the court of appeals, another pointing to "limiting language" at the end of the indemnification clause, and a final set of arguments that encompass various defects in the physical formatting and presentation of the Client Intake Form. None of these theories prevail on these facts. We now address each in turn.

1.

First, Lund argues that the partial dissent at the court of appeals, rather than the majority, correctly applied our strict construction standard in concluding that Lund's claims against Calhoun Orange were not barred by the liability paragraph. The dissent concluded that there was a direct contradiction between the liability paragraph's indemnification clause ("sentence four") and the exculpatory clause preceding it ("sentence three"), because sentence three purported to exculpate Calhoun Orange for "all claims" (making it unenforceable against claims of negligence under our rule from *Justice*), and sentence four limited indemnification to acts of negligence. *Lund*, 2023 WL 8368507, at *10 (Cleary, J., concurring in part and dissenting in part). Echoing the partial dissent, Lund contends that the two sentences "contradict one another," and thus "fail to meet the strict construction requirements," meaning "the contract must be interpreted against Calhoun Orange." *Id.* at *8, *10.

Responding to this contention at oral argument, Calhoun Orange said that if sentence three of the paragraph is ruled unenforceable under *Justice*, that clause should be

excised from the contract, leaving sentence four to be read in isolation. We reject this approach. Central to our strict construction analysis is the concern that a contractual provision which "relieve[s] one party of the obligation to use due care," must adequately apprise all parties to the contract of the full extent of the rights they are waiving. *Justice*, 979 N.W.2d at 901 (quoting 57A Am. Jur. 2d *Negligence* § 46 (2022)) (internal quotation marks omitted). Because a party's understanding of the liability paragraph would have necessarily included both sentence three and sentence four, we find it illogical to retroactively sever sentence three from the contract simply because we now deem it unenforceable against claims of negligence. We therefore hold that where a liability paragraph contains two liability-shifting clauses of diverging scope, these clauses must be read together, placing the court in the shoes of the parties signing the contract. If these two clauses were to stand in direct conflict with one another or to be of irreconcilable scope, it would logically follow that such a direct conflict could render the entire waiver equivocal.

But there is no such direct conflict here. Lund is correct that sentence three, standing alone, would be unenforceable against claims of negligence under the rule we announced in *Justice*. But in *Justice* we held that an entity that purports to exculpate itself for "any and all claims" does not lawfully shield itself from claims of negligence because that language "does not specifically provide that it releases [the party] from liability for its own negligent acts." *Justice*, 979 N.W.2d at 902. In this case, sentence four remedies that problem. By expressly providing for indemnification of claims related to "acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and assigns," the specificity concerns

12

raised by the waiver from *Justice* are no longer present. To be sure, the liability paragraph's third and fourth sentences differ in scope—but they do not contradict each other. While sentence three would have been insufficient on its own to preclude Lund's claims, it does not obfuscate what is made clear in the fourth sentence: that the Client Intake Form was intended to indemnify Calhoun Orange for claims related to its own negligence by shifting liability back to the injured party, "thus producing the same result as an exculpatory provision." *Justice*, 979 N.W.2d at 901 (quoting 57A Am. Jur. 2d *Negligence* § 43).

2.

Second, Lund argues that language at the end of sentence four—"arising from or in connection with the activities that Client voluntarily participates"—makes the scope of Calhoun Orange's indemnity unclear despite its express reference to acts of negligence. Lund argues that the language operates as "limiting language," and renders the clause unenforceable. We have held that "additional limiting language" in an indemnity agreement can "render an otherwise clear and unequivocal provision equivocal, thus precluding indemnity." *National Hydro Systems v. M.A. Mortenson Co.*, 529 N.W.2d 690, 694 (Minn. 1995). Lund states that the "arising out of" language in the Client Intake Form has that effect here.

We conclude that the additional language Lund relies on does not render the liability paragraph's fourth sentence equivocal. The context of our discussion of "limiting language" in *National Hydro* was a question of whether an indemnification clause clearly and unequivocally encompassed claims arising from acts of the indemnitee's own negligence. *Id.* The contract in that case stated that "the contractor shall indemnify and

13

hold harmless and defend the commission and the engineer and their agents . . . against all claims . . . of any nature or form whatsoever whether founded in breach of contract, negligence, or pursuant to [c]ontract provisions . . . which arise out of or result from performance of the work by contractor." *Id.* at 692 (emphasis omitted). We determined that the language, "which arise out of or result from performance of the work by contractor," made the scope of the indemnity unclear—therefore, we held that the contract did not "clearly and unequivocally express[] an intent to indemnify [the indemnitee] for claims based on [its] own negligence." *Id.* at 694. But because the provision here expressly contemplates indemnification for "all acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and assigns," neither the party to be indemnified (the gym, Calhoun Orange) nor the acts covered by the indemnification (acts of negligence) are called into question by the language Lund cites.

3.

Finally, Lund argues that the format of the Client Intake Form made the liability paragraph unclear and difficult to understand. Lund points out that the generic title of the form did not notify Karasov that it contained a waiver, and that the liability paragraph was part of a list of four numbered, unlabeled paragraphs in small font—while the entire top part of the form was printed in larger font, and the policies below the liability paragraph all had bolded and underlined titles such as "Late Cancel Policy," and "Dress Code Policy." Moreover, although Calhoun Orange required clients to sign their initials in a separate box to indicate their consent to a $69 or $99 charge for failure to return equipment at the end

14

of class, Karasov's agreement to the liability paragraph was simply presumed by his signature at the bottom of the document. Lund argues further that the waiver paragraph is repetitive, dense, and filled with legalese—and that throughout the form, there are numerous grammatical and typographical errors. In light of these considerations, Lund asks us to adopt the reasoning of decisions from other jurisdictions holding exculpatory clauses to be unenforceable when they are "not conspicuous." *See, e.g.*, *Atkins v. Swimwest Fam. Fitness Ctr.*, 691 N.W.2d 334, 341–42 (Wis. 2005).

But Lund did not raise these format-related arguments at the district court, at the court of appeals, or in her petition for review. Rather, she asserted them for the first time in her briefing to our court and at oral argument. The question, therefore, is not properly before us and is forfeited. *See In re GlaxoSmithKline PLC*, 699 N.W.2d 749, 757 (Minn. 2005) ("Generally, we do not address issues that were not raised in a petition for review."). We reiterate here that exculpatory and indemnification clauses are not favored in the law. But whether the Client Intake Form's format was deficient to the extent that it failed to provide Karasov with a clear and unequivocal communication of Calhoun Orange's intent to indemnify itself for acts of its own negligence is not a question that is properly before us. We express no view today as to how we may rule on such questions in future cases.

\*   \*   \*

Reading the exculpatory clause in sentence three of the liability paragraph in Calhoun Orange's Client Intake Form together with the indemnification clause in sentence four, we hold that, because sentence four states "[c]lient hereby agrees to indemnify . . . the Studio and Facility from all claims, demands, injuries, damage actions [sic] causes of

15

action and from all acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and assigns," the form manifested a clear and unequivocal intent to indemnify Calhoun Orange for acts of its own negligence, making it enforceable under our strict construction standard. And here, this indemnification clause produces the same result as an exculpatory provision because it shifts liability back to the injured party. Thus, the court of appeals correctly affirmed the district court's grant of summary judgment to Calhoun Orange on Lund's claims of ordinary negligence.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

MCKEIG, HENNESY, and GAÏTAS, JJ., took no part in the consideration or decision of this case.

16